CHARLES S. HARRIS, Plaintiff in Error, *vs.* NORMAN AN-
THONY.—(E. J. KING *et al.* Exrs., Defendants in Er-
ror.)

*Opinion filed October 28, 1913—Rehearing denied Dec. 3, 1913.*

CONTRACTS—*when a contract between attorney and client must
be upheld.* A contract between attorney and client making a set-
tlement of their accounts for past years, fixing compensation for
yearly employment in the future and giving the attorney an option
to purchase a tract of land from the client at a specified price
must be regarded as fairly obtained notwithstanding their relation
as attorney and client, where to hold otherwise would require dis-
regarding the testimony of four disinterested witnesses, none of
whom were impeached or shown by anything in the record to be
unworthy of belief.

WRIT OF ERROR to the Circuit Court of Knox county;
the Hon. GEORGE W. THOMPSON, Judge, presiding.

WILLIAMS, LAWRENCE, WELSH & GREEN, and WEBB
A. HERLOCKER, for plaintiff in error.

E. J. KING, R. D. ROBINSON, and CHARLES DICKER-
SON, for defendants in error.

Mr. JUSTICE FARMER delivered the opinion of the court:

This is a suit by the plaintiff in error for specific per-
formance of an agreement of Norman Anthony for the
conveyance of 160 acres of land. Since the decree in the
circuit court Anthony died testate, and his executors have
been made parties defendant.

Plaintiff in error had for several years prior to Novem-
ber 27, 1903, been the attorney for Anthony, who was the
owner of a large amount of property. On said 27th day
of November, 1903, the following instrument was signed
by the parties:

"It is agreed by and between Norman Anthony, of the city of
Galesburg, in the county of Knox and the State of Illinois, of the
first part, and Charles S. Harris, of the city of Galesburg, in the

county of Knox and State of Illinois, of the second part, as follows: The party of the second part has been employed by the party of the first part for a long time last past and no settlement has been had and no adjustment of the amount due the party of the second part has been made. The party of the first part is now about to depart for the State of California for his health, and realizing the uncertainty of life and not desiring to leave matters unsettled at his death, has agreed with the party of the second part and has requested him to write out a full statement of this settlement, to-wit: The party of the first part is indebted to the party of the second part in the sum of four thousand one hundred and fifty dollars, ($4150,) after adjusting all accounts, except for hay, corn and oats delivered from the farm to the party of the second part, the amount of which is now unknown to us but is in the hands of Bushong, on farm. Said amount is now due and will draw interest after January 1, A. D. 1904, until paid, at five per cent per annum. Until further notice the second party will continue to be employed as my attorney for all things in which I may desire his services, at the rate of $400 per annum. The party of the first part has requested the party of the second part to purchase the following lands in the county of Knox, in the State of Illinois, to-wit: The S. E. qr. of Sec. thirty-four (34), in Tp. twelve (12), north, range four (4), east, for the sum of five thousand dollars ($5000.) The second party has the privilege of accepting said proposition at any time before the amount due him herein shall have been fully paid. If the second party shall elect to purchase said lands in accordance with the above proposition and shall pay to the first party the difference, in cash, between the amount due the party of the second part and the purchase price, then the party of the first part shall convey by warranty deed, clear of all encumbrance, to the party of the second part, his heirs or assigns, said lands.

"Dated this 27th day of November, A. D. 1903.

NORMAN ANTHONY, (Seal)
CHARLES S. HARRIS. (Seal)"

The instrument was acknowledged before James H. Weeks, a notary public. The plaintiff in error continued to act as attorney for Anthony until about January 1, 1906, when Anthony terminated his employment without having made any settlement with him for his services. The bill alleged that there was due plaintiff in error from Anthony $4150, with interest at five per cent from January 1, 1904,

and the further sum of $800 for attorney's fees. It also alleged that the plaintiff in error had elected to take the land mentioned in the agreement at $5000, and that he had applied to Anthony for a conveyance to him of said land, and offered to pay whatever difference there might be, if any, due Anthony after deducting from $5000 (the purchase price of the land) the amount due the plaintiff in error for attorney's fees.

The defendant answered the bill, denying he was indebted to complainant; denying the existence of the contract alleged in the bill; denying that the complainant had acted as his attorney until January 1, 1906, and, generally, denying all the material allegations in the bill. Defendant also filed a cross-bill, in which he alleged that he was eighty-one years old, practically deaf, and that his eyesight was not good; that at the time of the execution of the supposed agreement set out in the original bill complainant was cross-complainant's attorney and had been for some time prior thereto; that cross-complainant had no knowledge or recollection of said agreement and had no recollection that he ever knowingly executed it. The cross-bill further alleged that if any such agreement was executed there was no consideration for it; that the complainant had never performed services in any such amount as was named in the agreement; that the cross-complainant had paid complainant the value of the services theretofore rendered, and that the contract or agreement was signed at the request of the complainant while he was acting as attorney and legal adviser of cross-complainant, if it was signed by cross-complainant at all, and that it was obtained by misrepresentation and fraud of complainant. The cross-bill further alleges that the land described in the agreement is worth $6000 or $7000, and that the cross-complainant has at all times been abundantly able to pay complainant any amount he owed him, and is now ready and willing to do so, but denies the valid-

ity of the agreement and the complainant's right to specific performance, and prays that said agreement be canceled.

After answer to the cross-bill and replications thereto were filed the cause was referred to the master in chancery to take the proof and report his conclusions. The master reported that the proof sustained the allegations in the original bill, and that, after allowing all credits Anthony was entitled to, on January 1, 1904, $3990.11 was due the plaintiff in error, which, with the interest to date of report, amounted to $5152.21. He further found Anthony was liable to plaintiff in error for $800 for two years' services ending January 1, 1906, upon which he was entitled to certain credits, leaving a balance due plaintiff in error on that account of $79.74, making the total amount due plaintiff in error, after deducting all credits to which Anthony was entitled, $5197.47. The master further reported that the plaintiff in error was entitled to a conveyance of the land described in the agreement, and recommended a decree to that effect and that the cross-bill be dismissed for want of equity. Exceptions of Anthony to the master's report were sustained by the chancellor, and an order was made that the plaintiff in error was not entitled to a decree for specific performance, that the proof failed to show an adequate consideration for the purchase of the land, and that so much of the contract as attempted to settle the account between the parties by the sale and purchase of the land described is void and of no effect.

The cause was re-referred to the master on the cross-bill, with directions to take such additional evidence touching on an accounting between the parties as might be offered by either of them, from 1893 to the date of filing the cross-bill, and to report a statement of the account, with his conclusions. Under this reference the master heard evidence, stated the account, and reported that there was a balance due the plaintiff in error, after allowing all credits,

of $3588.61. Exceptions of Anthony to this report were
sustained by the chancellor and the cause re-referred to the
master. The order of reference directed the master to re-
port to the court, from the evidence already taken, whether
the contract sued on was executed by Anthony and enforce-
able, except as to the provision for the purchase of the land.
The master was further directed to state the amount due
the plaintiff in error, if anything, under the contract, to-
gether with the credits, if any, to which Anthony was en-
titled. Under this reference the master reported that the
agreement sued on was executed by Anthony on the day it
bears date. He further reported that the evidence was not
sufficient to warrant finding that the agreement was so fair
and reasonable as to be enforceable, on account of the con-
troversy being between parties sustaining fiduciary relations
towards each other at the time the agreement was entered
into. He made no report at this time as to the amount due
the plaintiff in error. Exceptions to this report were filed
by the plaintiff in error.

Upon the final hearing and determination of the cause
by the chancellor a decree was entered finding that the
agreement sued on was executed by Anthony; that at the
time it was executed plaintiff in error was, and had before
been, acting as attorney for Anthony; that the relation of
attorney and client existed between them, and that the proof
was not sufficient to show the contract was fair and ade-
quate and that there was sufficient consideration to support
it, either as a contract for the conveyance of the land or as
a settlement of accounts between the parties. The decree
further finds that after making the contract the plaintiff in
error continued to act as attorney for Anthony, under its
terms, for $400 per year, and that the contract for the space
of one year was reasonable and a sufficient consideration
was shown to support it; that the contract was terminated
by Anthony after the expiration of one year from its date

but that plaintiff in error continued to act as his attorney for special matters, and that there was due the plaintiff in error, after allowing all credits and deductions, $1026.89. The original bill was dismissed, and the decree, under the cross-bill, directed the payment to the plaintiff in error of $1026.89 by Anthony.

A determination of this case depends largely upon the facts. It was proven beyond question that Anthony signed the written agreement and acknowledged it before a notary public. He testified that he had no recollection of it, and some little effort was made to prove that his mental and physical condition was such at the time that he was incapable of transacting business. A doctor who treated him ten days before the agreement was executed testified he had indigestion, which caused severe paroxysms of pain, which he thought unfitted him for the transaction of business. One or two relatives testified to Anthony having attacks of indigestion, and that when suffering from them they thought his mind was such that he could not understandingly transact business. This proof, of itself scarcely sufficient to raise a suspicion that Anthony was at any time mentally affected, was wholly and overwhelmingly overcome by testimony of his ability to transact, and of his actually transacting, the business connected with his large estate and property. It is true, he was old, his hearing defective and he was blind in one eye, but he was capable of managing, and did manage, his large property interests, and there is no evidence that he did not do it intelligently and successfully.

The agreement was executed at the house where Anthony was living, and the plaintiff in error testified that it was agreed between him and Anthony, in view of the latter's contemplated trip to California, that they should have a settlement reduced to writing; that they talked over its terms, and it was agreed that the plaintiff in error should draw it up in writing and bring or send it to Anthony at

the house where he was living; that he prepared it, took
it to Anthony and left it with him while he went after a
notary public to take the acknowledgment. The notary pub-
lic testified that when he and the plaintiff in error went to
the house Anthony was up-stairs; that he came down-stairs
with the instrument in his hand, went to a table, signed it,
and while plaintiff in error was signing it arose from his
chair and engaged in conversation with the notary about
his proposed trip to California. He testified the agreement
was not read over in his presence by either of the parties
and that there was no conversation between them about it.
Anthony admitted the signature to the contract was in his
handwriting.

It is not disputed that the plaintiff in error had been
Anthony's attorney since 1893 and for some time prior
thereto. Plaintiff in error testified that after he had rep-
resented Anthony, as his attorney, in some matters, about
1893 Anthony employed him to represent him in all mat-
ters in which he wished to avail himself of the services of
an attorney. At that time there was no agreement or un-
derstanding between them as to the amount that should be
paid to the plaintiff in error, but subsequently it was agreed
between them, verbally, that the plaintiff in error's com-
pensation should be $400 per year. There was no written
agreement between them prior to that of November 27,
1903. . Plaintiff in error further testified that previous to
the making of that agreement Anthony had talked with him
about his indebtedness to the plaintiff in error by virtue of
this employment of him by the year as his attorney, and
had said he did not have the money to pay him and re-
quested him to take a conveyance of the 160 acres of land
described in the agreement at a valuation of $5000 and pay
Anthony the difference between that sum and the amount
he owed the plaintiff in error, but that the plaintiff in error
never agreed to the proposition until the written agreement

was made between them. All this was flatly denied by Anthony. He denied ever having employed the plaintiff in error by the year or that he ever proposed to convey him the land on account of the fees owed him.

Mrs. Lambert testified that she was in the office of the plaintiff in error in November, 1903, when Anthony came in and said he was going to leave in a few days for California; that the thing that impressed the circumstance on her mind was that Anthony said he was going to Los Angeles, and the witness had a sister there. She testified that Anthony told the plaintiff in error he wanted to put their settlement in writing; that he could not pay the plaintiff in error the money he owed him then but would pay him interest; that he further said that if the plaintiff in error was ready to take a deed to a timber tract of land mentioned, for $5000, he was ready to make it; that he owed the plaintiff in error four thousand and some dollars,—the witness could not remember the exact amount,—and he told the plaintiff in error to make out the contract and bring it to his room, as he was not able to climb the stairs again to the plaintiff in error's office. The witness testified she was again in the plaintiff in error's office in May or June, 1904, and that Anthony and one or two other people were there at that time; that Anthony said to the plaintiff in error he wanted a settlement and wanted him to take the land referred to, but plaintiff in error told him he wanted the money.

Will Douglas testified that he was in the office of the plaintiff in error in June, 1904; that he lived near to and was familiar with the land in controversy; that Anthony came into the office and told plaintiff in error he wanted him to take the land in settlement of his claim against him, Anthony; that plaintiff in error did not seem to want to take the land, saying he could use the money better than the land; that Anthony wanted $5000 for the land and wanted

the plaintiff in error to pay the difference between that sum and the amount Anthony owed him.

Mrs. Rose Hereford testified she was in the office of the plaintiff in error in the fall of 1895 when Anthony was present and heard a conversation between him and plaintiff in error; that Anthony told plaintiff in error he wanted to settle with the firm of Harris & King; that he had employed plaintiff in error by the year and did not want any other attorney presenting claims for fees to him; that she was in the office of the plaintiff in error again in the fall of 1901, when Anthony was present and he and the plaintiff in error were talking about a settlement; that plaintiff in error was urging a settlement, and said the matter had run on for a good many years and ought to be settled; that Anthony said he was owing the plaintiff in error for seven years' services, but that he had a good chance to sell the hotel he owned, and if he did he would pay the plaintiff in error and all his other debts. The witness was again in plaintiff in error's office about April, 1903, when Anthony was present; that he had just returned home, and plaintiff in error told Anthony that as he was going away again he ought to settle with him; that Anthony said he was owing plaintiff in error for ten years' services, less payments he had made; that he owed $4000, with interest, less the payments made, and promised to settle.

A. M. Brown, an attorney practicing in Galesburg, testified he had some business with the plaintiff in error and Anthony in connection with the sale of property belonging to the heirs of an estate; that Anthony was to be a purchaser, and when witness and his clients went to the office of plaintiff in error and met Anthony, a controversy arose between Anthony and the witness about consummating the transaction, in the course of which the witness threatened to bring suit against Anthony, and Anthony replied, pointing to the plaintiff in error: "There is my attorney; I have

him employed by the year; you can find him at any time
you want to."

That the plaintiff in error was employed by Anthony
regularly appears to be recognized by Anthony in a letter
written by him to the plaintiff in error from Sharon, New
York, on August 4, 1904. The letter refers to certain busi-
ness matters and expresses dissatisfaction about a lease
made by the plaintiff in error for the defendant's hotel
property, in Galesburg. The letter concludes: "I am will-
ing you should resign as to the matter; you can put it in
a letter & drt to Nom Malick care, as I will keep him posted
as where letters will find me, and I will accept and make
other arrng."

The testimony of the parties to the suit, and of the four
witnesses mentioned, is the only evidence we find in the
record throwing any light upon the issue whether the plain-
tiff in error was employed by Anthony, as his attorney, by
the year. It is claimed that the testimony of the plaintiff
in error is weakened, if not overcome, by other evidence,
facts and circumstances in the record. The testimony of
Anthony is as much, if not more seriously, affected by other
evidence in the case, and he is not corroborated. It would
be idle to contend that Anthony did not know what he was
doing when he signed the agreement. If it was not bind-
ing, it was because the plaintiff in error took advantage of
his relations with Anthony and overreached him. Conced-
ing that the burden was upon the plaintiff in error to prove
that the agreement was reasonable and that it was fairly
and understandingly entered into by Anthony, we are un-
able to see how it can be said that the testimony of the
plaintiff in error does not meet this requirement. Unless
we can say that the four disinterested witnesses who cor-
roborated the plaintiff in error are unworthy of belief, we
are obliged to hold that the great weight of the proof shows

the plaintiff in error was employed by Anthony by the year at a salary of $400, that it was his proposition that he convey the land, and that the agreement was not procured by fraud, undue influence or by any advantage taken by the plaintiff in error of his relation to Anthony. The witnesses referred to were not impeached, and there is nothing in the record, so far as we are able to discover, that will justify us in disregarding their testimony. If the question for decision were whether the agreement to employ the plaintiff in error by the year at a salary of $400 was wise, we would say that in our judgment it was not. But that is not the question before us. The question we must pass upon is whether there was such an agreement between the parties. That there was such an agreement is supported by the weight of the testimony, and it does not appear to have been so unfair and inequitable as to be unenforceable. While we think the compensation agreed upon was very liberal, yet the proof shows that during the period of plaintiff in error's employment he attended to a considerable amount of litigation for Anthony, some of it quite important, and that he also did a considerable amount of business that never got into the courts. He was furthermore bound by the agreement not to accept employment from any other person about matters in which Anthony was interested. The record contains the testimony of reputable attorneys of the Knox county bar who knew the parties, and in a general way of the business transacted by the plaintiff in error for Anthony, that $400 per year was reasonable compensation. The chancellor by final decree sustained and enforced the contract of employment for one year after it was made at $400, and we are unable to see why, if that much of it was enforceable, it was not valid in its entirety. We see no objection to the enforcement of the contract on the ground of lack of mutuality.

Under the proof we feel compelled to reverse the decree and remand the cause, with directions to enter a decree in accordance with the prayer of the original bill.

*Reversed and remanded, with directions.*

Mr. JUSTICE CRAIG having been of counsel in matters involved in this case took no part in the decision.